# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

WILLIAM A. GREGORY,

      Petitioner,

v.                                                    Case No. 3:18-cv-1378-TJC-MCR

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## **ORDER**

## I.   **Status**

Petitioner, William A. Gregory, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. Doc. 1. Petitioner challenges a state court (Flagler County, Florida) judgment of conviction for two counts of first degree murder. Petitioner is serving a life term of incarceration. Respondents filed a Response. See Doc. 13 (Resp.).[1] Petitioner replied. See Doc. 18. This case is ripe for review.

---

[1] Attached to the Response are several exhibits. The Court cites the exhibits as "Resp. Ex."

## II.   <u>Governing Legal Principles</u>

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert. denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>See</u> <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or

2

argued to the state supreme court or obvious in the
record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a

federal court cannot grant habeas relief unless the state court's adjudication of

the claim was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United

States," or "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1),

(2). A state court's factual findings are "presumed to be correct" unless rebutted

"by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for
> evaluating state court rulings" and "demands that
> state-court decisions be given the benefit of the doubt."
> Renico v. Lett, 559 U.S. 766, 773 (2010) (internal
> quotation marks omitted). "A state court's
> determination that a claim lacks merit precludes
> federal habeas relief so long as fairminded jurists could
> disagree on the correctness of the state court's
> decision." Harrington v. Richter, 562 U.S. 86, 101
> (2011) (internal quotation marks omitted). "It bears
> repeating that even a strong case for relief does not
> mean the state court's contrary conclusion was
> unreasonable." Id. [at 102] (citing Lockyer v. Andrade,
> 538 U.S. 63, 75 (2003)). The Supreme Court has
> repeatedly instructed lower federal courts that an
> unreasonable application of law requires more than
> mere error or even clear error. See, e.g., Mitchell v.
> Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at
> 75 ("The gloss of clear error fails to give proper
> deference to state courts by conflating error (even clear

> error) with unreasonableness."); <u>Williams v. Taylor</u>,
> 529 U.S. 362, 410 (2000) ("[A]n unreasonable
> application of federal law is different from an incorrect
> application of federal law.").

<u>Bishop v. Warden, GDCP</u>, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

### B. Ineffective Assistance of Trial and Appellate Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

This two-part <u>Strickland</u> standard also governs a claim of ineffective assistance of appellate counsel. <u>Overstreet v. Warden</u>, 811 F.3d 1283, 1287 (11th Cir. 2016). When considering deficient performance by appellate counsel,

> a court must presume counsel's performance was
> "within the wide range of reasonable professional

assistance." <u>Id.</u> at 689, 104 S. Ct. 2052.  Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments.  See <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264 (11th Cir. 2009).  "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000) (quoting <u>Gray v. Greer</u>, 800 F.2d 644, 646 (7th Cir.1986)); <u>see also</u> <u>Burger v. Kemp</u>, 483 U.S. 776, 784 (1987) (finding no ineffective assistance of counsel when the failure to raise a particular issue had "a sound strategic basis").

<u>Id.</u>; <u>see also</u> <u>Owen v. Sec'y, Dep't of Corr.</u>, 568 F.3d 894, 915 (11th Cir. 2009) ("failing to raise or adequately pursue [meritless issues on appeal] cannot constitute ineffective assistance of counsel").

To satisfy the prejudice prong of an ineffective assistance of appellate counsel claim, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." <u>Black v. United States</u>, 373 F.3d 1140, 1142 (11th Cir. 2004); <u>see also</u> <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264-65 (11th Cir. 2009) (prejudice results only if "the neglected claim would have a reasonable probability of success on appeal"). Also,

[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>, at 694, 104 S. Ct. 2052.  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u>, at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant

> of a fair trial, a trial whose result is reliable." <u>Id.</u>, at
> 687, 104 S. Ct. 2052.

<u>Richter</u>, 562 U.S. at 104. As such, "[a]ppellate counsel might fail to identify a mediocre or obscure basis for reversal without being ineffective under <u>Strickland</u>." <u>Overstreet</u>, 811 F.3d at 1287 (citation omitted).

For both claims of ineffective assistance of trial counsel and appellate counsel, there is no "iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court

decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

## III.    **Evidence Presented at Trial and Procedural History**

This case involves the murders of Skyler Meekins and Daniel Dyer. For context, the Court summarizes the evidence presented at trial, as stated in the parties' briefs filed in Petitioner's direct appeal. In 2007, Petitioner and victim Skyler Meekins had a romantic relationship and lived with Skyler's grandparents. Resp. Ex. C at 5. During their relationship, Petitioner and Skyler's brother, Colton, became good friends. <u>Id.</u> Petitioner and Skyler had a daughter, but before their daughter turned one, Petitioner moved out of Skyler's grandparents' home and began living with his mother. <u>Id.</u> Petitioner was arrested in June 2007, and while he was housed at the Flagler County jail,

Petitioner would often call Colton in hopes of speaking with Skyler.[2] Id. During trial, the state presented several audio recordings of these jail calls, during which Petitioner asked intrusive and obsessive questions about guys Skyler may be dating while Petitioner was in jail and requested Colton to check Skyler's email and online accounts for evidence that she was seeing other guys. Id. at 5-8. The state also presented recordings of jail phone calls between Petitioner and Skyler, during which Skyler expressed anger at Petitioner's jealousy and suggested she and Petitioner were no longer a couple. Id. at 6. The state presented evidence that Petitioner repetitively called Skyler, leaving messages and asking others to three-way call Skyler in hopes she would answer. Id. at 6-11. And once Petitioner was released from jail, he would often go to Skyler's home uninvited and unannounced. Id. at 11. In July 2007, Skyler started dating victim Daniel Dyer. Id. at 12-13. The state presented evidence that Petitioner would also call Dyer's phone often. Id. at 13. And two nights before the murders, Petitioner called Dyer and stated, "I want to personally thank you for ruining my life." Id. at 13.

On the evening of the murders, Petitioner did drugs and drank alcohol with his brother Kory Gregory. Id. at 20. Petitioner and Kory got home around 10:00 p.m. and Kory fell asleep soon after. Id. at 21. Kory and Petitioner shared

---

[2] In June 2007, Petitioner was arrested for an unrelated drug charge.

a bedroom and at some point, in the middle of the night, Kory realized Petitioner was not in the room. Id. Kory testified that around 3:30 a.m., Petitioner came back into the bedroom and "was wet, he was mumbling . . . saying he was down at the beach." Id.

Between 1:00 a.m. and 2:00 a.m., Skyler's neighbors heard a car driving through the neighborhood and someone in an excited tone state, "We're over here" and "hurry up." Id. at 22. Skyler's grandmother Mary Anne Meekins, who lived with Skyler when she was murdered, testified that at 3:30 a.m. on August 21, 2007, she woke up to use the restroom and noticed a closet door where she stored the vacuum cleaner and her husband's guns was open, which was unusual. Id. at 14. Mary Anne did not hear anyone enter the house at any time after she went to sleep that night, but admitted that she could not hear well. Id. At 6:00 a.m., Mary Anne called out Skyler's name to wake her up for a dental appointment, and when Skyler did not answer, Mary Anne felt something was wrong and woke her husband. Id. at 14-15. Her husband then went into Skyler's room and found Skyler and Dyer had been murdered. Id. at 16. A Browning shotgun belonging to Skyler's grandfather, which was typically stored in the closet, and a shotgun shell were lying on Skyler's bedroom floor. Id. Skyler and Dyer had been shot in the head. Id. at 22. Three fingerprints found on the trigger and trigger guard of the shotgun matched Petitioner, and only Petitioner's prints were located on the weapon. Id. at 29.

Petitioner's phone records showed that Petitioner made several phone calls to Skyler's home on the night of the murder. Id. at 19. Petitioner also made two phone calls to a cab company no longer in service. Id. at 19-20. At 4:17 a.m., Petitioner called 911 and advised the dispatcher that he would like to turn himself in. Id. at 23. An officer was dispatched to a beachside location where Petitioner was located, and Petitioner advised the officer he thought there was a pending arrest warrant because Petitioner had been using drugs earlier that day, in violation of his probation. Id. The officer advised Petitioner that there was no warrant and that he should advise his probation officer of the violation. Id. Petitioner again called 911 around 8:26 a.m. after Colton left Petitioner a threatening voicemail advising Petitioner, "you better run." Id. at 23-24. Officers transported Petitioner to the police department for questioning and ultimately arrested him for a violation of probation based on his own admission of using drugs the night before, and later arrested and indicted him for the murders. Four jailhouse informants testified at trial about incriminating statements Petitioner made before and after the murders, including statements conveying he would kill Skyler if she ever cheated and describing that Petitioner jumped in the pool after the murders to wash off any gunshot residue. Id. at 29-34.

The jury found Petitioner guilty of both counts of first degree murder, one count of burglary, and one count of possession of a firearm by a convicted felon.

Following a jury recommendation of 7 to 5, the trial court sentenced Petitioner to death. The Florida Supreme Court affirmed Petitioner's convictions and death sentence. See Gregory v. State, 118 So. 3d 770 (Fla. 2013). Thereafter, with help from postconviction counsel, Petitioner filed with the trial court a Florida Rule of Criminal Procedure 3.851 motion for postconviction relief. Resp. Ex. H. The trial court conducted an evidentiary hearing on the Rule 3.851 motion, during which it considered testimony from, inter alia, Leigha Weber Furmanek, Petitioner's younger sister; Mary Lou Wilson, Petitioner's grandmother; Lynda Wilson, f/k/a Lynda Probert, Petitioner's mother; and Gary L. Wood, Petitioner's trial counsel. Resp. Exs. J1-J4. Following the hearing, the trial court denied the Rule 3.851 motion. Resp. Ex. K. Petitioner appealed, but during his appeal, he filed with the trial court a successive Rule 3.851 motion alleging a claim of newly discovered evidence. Resp. Ex. S. The Florida Supreme Court relinquished jurisdiction to the trial court to consider the successive Rule 3.851 motion, and the trial court then summarily denied the newly discovered evidence claim. Resp. Ex. U.

Petitioner sought review of the trial court's order denying his successive motion by supplementing his pending appeal. He also simultaneously filed with the Florida Supreme Court a petition for writ of habeas corpus alleging a claim of ineffective assistance of appellate counsel. Resp. Ex. N. The Florida Supreme Court issued a written opinion affirming the trial court's denial of Petitioner's

guilt phase claims, but vacated Petitioner's death sentence under <u>Hurst v. Florida</u>, 136 S. Ct. 616 (2016), and remanded for a new penalty phase. <u>See Gregory v. State</u>, 224 So. 3d 719 (Fla. 2017). In the same opinion, the Florida Supreme Court affirmed the trial court's denial of Petitioner's successive Rule 3.851 motion and denied on the merits his petition claiming ineffective assistance of appellate counsel. <u>Id.</u> Upon remand, the state withdrew its death notice and Petitioner was sentenced to two life terms of incarceration. This Petition followed.

## IV.   <u>Analysis</u>

### A. Ground One

Petitioner asserts that his trial counsel was ineffective for failing to adequately rebut the state's prosecution theory that Petitioner killed the victims because he was jealous and angry of Skyler and Dyer's new romantic relationship. Doc. 1 at 9-16.

Petitioner, with help from postconviction counsel, raised this claim in his initial Rule 3.851 motion. Resp. Ex. H at 8-13. The trial court conducted an evidentiary hearing on this claim, Resp. Exs. J1-J4, and then denied it, Resp. Ex. K. Petitioner appealed, and the Florida Supreme Court affirmed the trial court's denial, finding the following:

> Gregory contends that his attorney was ineffective because he failed to rebut the State's theory that he was a jealous ex-lover through the use of

12

testimony and photographs depicting Gregory's continued relationship with the victim, Skyler Meekins, in the months preceding her death. As to claim one, the postconviction court found:

> Mr. Gregory alleges trial counsel was ineffective due to his failure to rebut the State's theory that the Defendant was motivated by jealous anger. Counsel did offer evidence of the more favorable side to Mr. Gregory, and the victim, Skylar [sic] Meekins' relationship through the testimony of Leigha Furmanek, Mary Lou Wilson and Lynda Wilson, f/k/a Lynda Probert. Leigha testified in both the guilt and penalty phases of trial. At the evidentiary hearing she testified she had known Skylar [sic] Meekins for approximately twelve years and considered her a friend. Her brother, William Gregory, was in jail during most of June 2007. Leigha recalls going to Skylar's [sic] house and seeing her write letters to Mr. Gregory in jail, also that they spoke on the phone a lot. Leigha felt that they still cared about each other and weren't on bad terms. Mr. Gregory and Ms. Meekins had a child together who was not yet one at that time. During the months of June, July and August 2007 Ms. Meekins and Mr. Gregory had spent the night together at Leigha's house and had gone to a barbeque there. When Leigha bonded Mr. Gregory out of jail that July she had dropped her brother off at Skylar's [sic] house; she had talked to Skylar [sic] who asked her to bring him there. During July and August 2007 Mr. Gregory and Ms. Meekins had "a lot of contact" because they were planning their daughter's first birthday on July 31, 2007. Around that time Mr. Gregory advised

13

Leigha that Ms. Meekins was dating someone else and that he was "okay with that." This was along the same lines as Leigha's trial testimony.

Mr. Gregory's grandmother, Mary Ann Wilson and mother, Lynda Wilson also both testified at the trial that Gregory was still on and off with Skylar [sic] and she had spent the night at the Wilson's home, with Mr. Gregory. They were aware that Skylar [sic] was also dating Dan Dyer, but she and Mr. Gregory continued to see each other. Their testimony at the evidentiary hearing was consistent with that presented at the trial.

Mr. Wood testified that he made a strategic decision to omit some things from the jury such as pictures of Mr. Gregory and Ms. Meekins, and jail phone calls between them. The concern he had was the negative impact it would have on the jury due to victim impact concerns in death penalty cases. Attorney Wood decided not to put on the happy pictures of them shopping and having a birthday party for their daughter. He feared the jury would compare them to the pictures of the crime scene, and that it would have a negative impact on his client. Also on the phone calls when Mr. Gregory would get "lovey-dovey" Skylar [sic] Meekins would turn the conversation away to Kyla, their daughter. It appeared from the phone calls that Mr. Gregory was the pursuer, while Ms. Meekins, while accepting the calls, [wa]s not reengaging him.

It appears from the record that Attorney Wood's investigation was

14

thorough; his trial strategy well-reasoned. This court finds counsel was neither deficient nor prejudicial pursuant to the <u>Strickland</u> test.

(Record citations omitted).

We conclude that the trial court's factual findings are supported by competent, substantial evidence and that the conclusions as to deficiency and prejudice, along with its conclusions regarding the reasonable strategic decisions of counsel are factually and legally sound. This Court has explained "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." <u>Occhicone v. State</u>, 768 So. 2d 1037, 1048 (Fla. 2000). From the testimony presented, it is clear that Attorney Wood was aware of the photographs, jailhouse phone calls, and the additional testimony that other witnesses could have provided that Gregory contends should have been admitted to rebut the State's theory.

Moreover, as the postconviction court stated, Attorney Wood explained his trial strategy in relation to the photographs and jailhouse phone calls during the postconviction evidentiary hearing. Attorney Wood stated that he considered admitting the evidence to rebut the State's theory but ultimately decided against it fearing that it would constitute an indirect form of victim impact evidence. Additionally, as the postconviction court stated in its order, the jailhouse phone calls did not depict Gregory in the best light, showing his attempts to show affection to Skyler and her obvious rejection of Gregory, a point that would have served to favor the State's theory in this case that Gregory was a rebuked, jealous ex-lover. Attorney Wood's actions do not appear unreasonable in light of the circumstances. Accordingly, we conclude that

Attorney Wood was not deficient in this respect, and the postconviction court correctly denied this claim.

We also conclude that Gregory was not prejudiced by Attorney Wood's strategic decision. The jury heard and considered testimony and evidence that suggested Skyler and Gregory maintained an amicable relationship up to the time of the murders. The evidence presented at the postconviction evidentiary hearing through the photographs and testimony detailing Gregory and Meekins' ongoing relationship the summer before her death was largely cumulative to the evidence that was presented during the trial. During the trial, both Gregory's grandmother, Mary Ann Wilson, and Gregory's mother, Lynda Wilson, testified that Gregory was still on and off with Skyler and she had spent the night at the Wilson's home, with Gregory. They also testified that they were aware Skyler was dating Dan Dyer, even though she and Gregory continued to see each other. More importantly, the additional evidence could have led the jury to compare the photos of Meekins alive and well with those of the crime scene, and could have further highlighted to the jury that Skyler's one-year-old child was now without a mother. This is exactly what Attorney Wood feared.

Accordingly, Gregory is not entitled to relief on this claim.

Gregory, 224 So. 3d at 730-31.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable

16

determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground One is denied.

### B. Ground Two

Petitioner asserts that his trial counsel was ineffective for failing to present at trial the testimony of Sherri Meekins, Skyler's stepmother. Doc. 1 at 17-22. According to Petitioner, Sherri Meekins would have testified that the murder weapon, a shotgun, was typically stored in the same closet as the vacuum cleaner, and that Petitioner may have moved the shotgun to reach the vacuum cleaner, explaining why Petitioner's fingerprints were found on the weapon. Id.

Petitioner raised this claim in his counseled initial Rule 3.851 motion. Resp. Ex. H at 13. Following an evidentiary hearing, the trial court denied the claim, Resp. Ex. K at 4, and Petitioner appealed. The Florida Supreme Court affirmed the trial court's denial, explaining:

> Next, Gregory contends that his guilt phase counsel was ineffective because he failed to present the testimony of the victim's stepmother, Sherri Meekins, which included information inconsistent with the State's theory of the case. The postconviction court denied relief on this claim, stating:
>
>> Trial counsel testified that he did not call Sherri Meekins because she was "a loose cannon." Although she could have offered testimony concerning the possibility of Mr. Gregory handling the murder weapon her testimony would have

been a two-edged sword. Sherri Meekins could also testify that Mr. Gregory had called her earlier in the day and indicated to her, the victim's stepmother, that he would be at the property to see Skylar [sic] Meekins around the time of the murder. And that after their daughter was born Mr. Gregory and Skylar [sic] Meekins fought frequently; Gregory would hit Skylar [sic], and it would end up in terrible screaming and fighting. "Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000) (referencing Strickland, 466 U.S. at 689, 104 S. Ct. 2052).

(Record citations omitted).

Once again, we conclude that the trial court's findings of fact are supported by competent, substantial evidence and we agree with the trial court's mixed findings of fact and law as to the reasonableness of the strategic decision, as well as the lack of deficiency and prejudice, explained more fully below. Attorney Wood testified that he decided not to call Sherri Meekins because she was a "loose cannon" and because he did not want her to be able to say that Gregory had called her the day before the murders with a plan to come see Skyler. Meekins testified in her deposition and at the evidentiary hearing that Gregory called her and had wanted to come to the Meekins' property on the night of the murders to pay Skyler for a puppy. Meekins thought this was unusual because he had obtained the puppy some time before that. Meekins also testified that she suffers from a long history of mental illness and was manic at the time of the trial. Although Meekins testified at the evidentiary hearing to some points that could be helpful to Gregory, she also testified that she could not differentiate between guns;

18

had never seen Gregory touch the gun in the closet with the vacuum cleaner; Gregory was one of the oldest people who hung out at the Meekins' residence, while the other kids were middle and high-school aged; she was bothered by Gregory's behavior including an incident where he just came into her house uninvited in the middle of the night; and Gregory knew which doors were locked, which ones were not, and which ones were broken in the house where Skyler lived.

Further, Gregory's reliance on Sears v. Upton, 561 U.S. 945, 951, 130 S. Ct. 3259, 177 L.Ed.2d 1025 (2010), Porter v. McCollum, 558 U.S. 30, 39, 130 S. Ct. 447, 175 L.Ed.2d 398 (2009), and Williams v. Taylor, 529 U.S. 362, 396, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), is misplaced. In those cases, the Supreme Court acknowledged that potentially helpful evidence may not have been uniformly favorable to the defendant, but counsel's failure to investigate and develop that evidence fell below the standards expected of a reasonable capital defense attorney. In this case, by contrast, Attorney Wood carefully considered calling Meekins to testify. However, after concluding that her testimony was more harmful than helpful, he decided against it. This is the quintessential strategic decision, made after considering and weighing the benefits versus the harms. Accordingly, we conclude that Gregory's attorney was not deficient in this respect.

Additionally, Gregory has failed to demonstrate prejudice. As the State notes, had Attorney Wood called Sherri Meekins to testify that she saw Gregory shooting a gun, such information would not have lent any more credibility to Gregory's defense, nor would it have created reasonable doubt. Moreover, the State could have cross-examined Meekins and elicited such information as Gregory was planning on coming over to the Meekins residence on the night of the crimes for a reason she described as "strange" and that she was bothered by Gregory's behavior including an incident where he just came into her house uninvited, in the

19

middle of the night. Because Attorney Wood made a reasonable strategic choice after a thorough examination of the case, and even if trial counsel had elicited testimony from Sherri Meekins, there is no prejudice as our confidence in the outcome is not undermined.

Accordingly, Gregory is not entitled to relief on this claim.

Gregory, 224 So. 3d at 731-33.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Two is denied.

**C. Ground Three**

Petitioner contends that his trial counsel was ineffective for failing to impeach state witnesses Patrick Giovine and Tyrone Graves, two of the four inmate informants who testified at trial. Doc. 1 at 24-30.

Petitioner raised this issue in his counseled initial Rule 3.851 motion. Resp. Ex. H at 18-24. Following an evidentiary hearing, the trial court denied the claim, Resp. Ex. K at 4-5, and Petitioner appealed. The Florida Supreme Court affirmed the trial court's denial, finding as follows:

Gregory contends that trial counsel was ineffective for failing to impeach two jailhouse "snitches" who testified for the State at trial. The postconviction court denied this claim, stating:

> During the trial both Mr. Graves and Mr. Giovine were called by the state to testify about conversations they claimed to have had with Mr. Gregory in the Flagler County Inmate Facility; one witness prior to the murders and one witness after. The witness Graves was unable to identify anyone in the courtroom of being William or Billy Gregory, the Appellant. A review of the record demonstrates Attorney Wood successfully cross[-]examined Mr. Graves on many of the statements he made, including impeaching him with prior statements. Likewise, Attorney Wood conducted a thorough cross-examination of witness Giovine.

> At the evidentiary hearing Trial counsel testified that he handled the discrepancies in their testimonies on cross-examination. He felt he had effectively impeached them to poke holes in the state's case. He stated "[b]ased on the responses they gave and their demeanor and the way they appeared, I did not think the state had good witnesses out of either of those two individuals." "Fair assessment of attorney performance, for purposes of reviewing claim for ineffective assistance of counsel, requires that every effort be made to eliminate distorting effects of hindsight, to reconstruct circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time." Blake v. State, [180 So. 3d 89] (Fla. 2014) (citing Strickland, 466 U.S. at 689,

104 S. Ct. 2052). Review of the trial record does not demonstrate a deficiency; counsel appeared to have carefully picked issues he wished to impeach the witnesses on. Counsel made a strategic decision; counsel's reasonable trial decisions do not constitute ineffective assistance of counsel. <u>Jones v. State</u>, 845 So. 2d 55, 65 (Fla. 2003). Further, the testimony of these two witnesses was not prejudicial to the outcome of the case.

(Record citations omitted.)

The postconviction court's factual findings are supported by competent, substantial evidence and its conclusions as to deficiency and prejudice are not in error. Gregory contends that Attorney Wood should have used statements Giovine made during an initial interview with an investigator, which were inconsistent with the evidence presented at trial prior to Giovine's testimony in order to impeach Giovine. On cross-examination, trial counsel impeached Giovine with one prior felony conviction and one felony withheld; the fact his prison exposure was sixty years and he had entered a plea for eight to twelve years; the fact he had threatened the State that he would not testify unless he got a better deal; and the fact he was not going to testify but to save his own skin. It is clear that trial counsel had Giovine's statements, was familiar with them, and could impeach Giovine with the information contained therein if he thought it was beneficial to do so.

On cross-examination, trial counsel impeached Graves with his five prior felony convictions; the fact his first-degree felony charge was still pending and his possible prison exposure; the fact he had talked to a guard and other inmates, and read an article pertaining to the murders prior to giving his statement; and the fact he had been a confidential informant

previously. Gregory used Graves' jail PIN to call Skyler in an attempt to trick her into answering because she would not answer for Gregory. Based on Attorney Wood's impeachment of Graves at trial, it is clear that Attorney Wood had Graves' statements, was familiar with them, and could impeach Graves with the information contained therein if he thought it was beneficial to do so.

"[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." McLean v. State, 147 So. 3d 504, 510 (Fla. 2014) (quoting Strickland, 466 U.S. at 687, 104 S. Ct. 2052). As with other decisions Gregory's attorney made, the assertions regarding deficiency are classic attempts to assess counsel's conduct after the fact.

In this case, Gregory has not established that reasonable trial counsel would have used the statements to impeach Graves or Giovine as opposed to attacking the testimony on cross-examination as Attorney Wood did. It is unclear what Attorney Wood could have done differently that would have been more effective in this case.

Further, Gregory has failed to explain how he was prejudiced by any alleged deficiency. As Attorney Wood testified at the evidentiary hearing, he did not believe, following his cross-examination of both witnesses, that "the State had good witnesses out of either of those two individuals." There can be no prejudice for failing to further impeach Graves because even without Graves' testimony, the State could still argue that Gregory would repeatedly call Skyler in an attempt to reach her and then become frustrated when he could not. As to Giovine, who later recanted his testimony – the subject of Gregory's newly discovered evidence claim – the State presented three other

> jailhouse informants who testified in varying ways,
> including that Gregory prophetically stated that he
> would "blow [the victim's] f'ing head off" if she cheated
> on him. Giovine did not testify that Gregory actually
> confessed the murder to him, but only that Gregory
> said that he "did what he had to do" and that Giovine
> assumed that Gregory meant committing the murders.
>
> Accordingly, Gregory is not entitled to relief on
> this claim.

Gregory, 224 So. 3d at 733-34.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Three is denied.

**D. Ground Four**

Petitioner asserts that his trial counsel was ineffective for failing to review the accuracy of the transcript used to aid the jury's understanding of one of the jail phone calls played at trial and failing to correct one of the transcribed words. Doc. 1 at 31-35. According to Petitioner, the transcript contained the word "f**ker" instead of the correct word "f**king," which was prejudicial because the noun form implied Petitioner spoke to someone who advised that

24

Skyler and Dyer were together the night they were murdered. Id. He also suggests that trial counsel was ineffective for allowing the transcript to be admitted into evidence and submitted to the jury during deliberations. Id. at 32.

Petitioner raised this claim in his Rule 3.851 motion. Resp. Ex. H at 24. The trial court conducted an evidentiary hearing and then denied the claim. Resp. Ex. K at 5. Petitioner appealed, and the Florida Supreme Court affirmed the trial court's denial, explaining:

> Gregory contends that Attorney Wood was ineffective for failing to object to the erroneous transcription of one of the jailhouse phone calls presented at trial. Specifically, Gregory contends that on the call he actually stated to his mother: "I tried calling back a couple of times and that f***ing told me that, you know, she wasn't there," while the call was transcribed to indicate that he stated: "I tried calling back a couple of times and that f***er told me that, you know, she wasn't there." The postconviction court denied this claim, stating:
>
> > [Gregory alleges that] [t]rial counsel failed to correct a significant word found in state's Ex # 73 – "f[***]er" instead of "f[***]ing." Ex. # 73 is [an] audio recording of a jail call. It is alleged the transcript contained the error; Appellant also claims the transcript, with error, improperly went back with jury for deliberation.
> >
> > At the evidentiary hearing Attorney Wood testified that the ultimate meaning of the call did not change: "to listen to the phone call, it was very clear that Mr.

25

Gregory was not happy about Mr. Dyer being in the picture at all." Mr. Gregory did not protest to Attorney Wood that what was being presented to the jury was inaccurate. Mr. Gregory made no showing that the jury having read the word "f[***]er" instead of "f[***]ing" would have been more inclined to find him guilty.

The transcripts in this case were properly used as demonstrative aids and did not go back to the jury room. Attorney Wood testified it is his common practice to inspect the evidence that's been marked before the bailiff takes it back to the jury room and he did that in this case. He would not allow unmarked exhibits to go back to the jury room.

June Laws, the deputy clerk in the case sub [j]udice, testified that she separates marked exhibits from demonstrative aids, and only marked exhibits are given to the bailiff to take into the jury room. Deputy Taylor, the bailiff in this case, testified that he only took the marked exhibits back to the jury room.

Additionally, the Court repeatedly advised the jury to rely on the audio, it was the evidence; the transcripts were simply an aid. Mr. Gregory has failed to meet his burden, neither deficiency nor prejudice was shown as required by <u>Strickland</u>.

(Record citations omitted.) We agree. Gregory did not produce any evidence to support his assertion that the word "f***ing" was, in fact, transcribed inaccurately as the word "f***er," or that the difference in words undermined confidence in the outcome of the case.

26

Attorney Wood testified that Gregory was sitting beside him at counsel table, going through the transcripts as the jailhouse calls were being played for the jury, and Gregory never relayed to Attorney Wood that the calls had been inaccurately transcribed or otherwise indicated the transcription said something different from what he had said on the call. Moreover, Gregory did not produce any evidence demonstrating that the meaning of the jailhouse call was at all changed by the exchange of expletives from the noun to the adjective form, or that the jury, having read the word "f***er" in the demonstrative aid rather than "f***ing," would have been more inclined to find Gregory guilty. Attorney Wood testified that, regardless of the word, the overall meaning and intent behind the call was clear: Gregory was not happy that Meekins was dating another man.

Finally, the jury saw the transcript twice – once while the call was played and again on an overhead projector during closing arguments. There was testimony during the evidentiary hearing that the transcripts were properly used as demonstrative aids and did not go back into the jury room. Each transcript was collected at the end of the phone call to which it pertained. Accordingly, we conclude that Attorney Wood was not deficient.

Additionally, we conclude there was no prejudice in this case. Gregory has not demonstrated that the jury would have reached a different conclusion if the transcription, which they saw only twice for a short period of time, read "f***ing" instead of "f***er." As Attorney Wood testified at the postconviction evidentiary hearing, regardless of the word choice, from Gregory's tone and demeanor during the phone call, it was clear that Gregory was not happy that Dyer was in the picture. Thus, it was Gregory's overall tone and demeanor on the call that was the most damaging aspect of the testimony, not the exact language he used.

27

Accordingly, Gregory is not entitled to relief on this claim.

Gregory, 224 So. 3d at 734-36.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Four is denied.

### E. Ground Five

Petitioner asserts that after his trial, he received newly discovered evidence that would have affected the outcome of his trial. Doc. 1 at 36. In support of this claim, Petitioner contends that after trial, a staff investigator with CCRC-M interviewed state witness and jail informant Patrick Giovine who recanted his trial testimony. Id. Giovine provided an affidavit outlining his recantation, in which Giovine stated that before Petitioner's trial, he and Petitioner were cellmates. Id. at 38. He attested that while they were housed together, Petitioner never admitted guilt and that the state investigators and attorneys pressured Giovine to testify against Petitioner at trial, mandated that

Giovine testify to specific facts, and threatened him with a long prison sentence if he refused. Id.

Petitioner raised this claim in his successive Rule 3.851 motion. Resp. Ex. S. The trial court summarily denied the motion. Resp. Ex. U. The Florida Supreme Court then affirmed the denial, finding the following:

> After the circuit court's denial of Gregory's postconviction claims of ineffective assistance of counsel, Gregory filed a successive postconviction motion in the circuit court alleging newly discovered evidence. Specifically, Gregory's motion was based on the affidavit of State witness, Giovine, which purports to recant the testimony Giovine gave during Gregory's original guilt phase trial. Because the denial of the postconviction motion was on appeal, this Court relinquished jurisdiction for the trial court to address this newly discovered evidence claim.

> The circuit court did not hold an evidentiary hearing but denied Gregory's motion after concluding that although Giovine's statement appeared to be a recantation of his prior testimony, it would not have led to an acquittal or lesser sentence for Gregory in light of the evidence presented against him.

> A defendant may obtain a new trial based on newly discovered evidence if he satisfies two requirements. "First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence." Tompkins v. State, 994 So.2d 1072, 1086 (Fla. 2008). "Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Id. (citing Jones v. State, 709 So. 2d 512, 521 (Fla. 1998)). "If the defendant is seeking to vacate a sentence, the second prong requires that the

newly discovered evidence would probably yield a less severe sentence." Id. (citing Jones v. State, 591 So. 2d 911, 915 (Fla. 1991)). In cases concerning recanted testimony as newly discovered evidence, the court must be satisfied that the recantation is true and that the recanted testimony would probably render a different outcome in the proceeding. Davis v. State, 26 So. 3d 519, 526 (Fla. 2009). Further, when "determining the impact of the newly discovered evidence, when a prior evidentiary hearing has been conducted, the trial court is required to consider all newly discovered evidence which would be admissible at trial and then evaluate the 'weight of both the newly discovered evidence and the evidence which was introduced at trial.'" Melton v. State, 193 So. 3d 881, 885 (Fla. 2016) (quoting Jones, 709 So.2d at 521).

Regardless of whether the affidavit represents a recantation of Giovine's testimony, we agree with the postconviction court that the new testimony would not have resulted in an acquittal on retrial. As the postconviction court stated:

> At trial, the State presented several witnesses who provided overwhelming evidence of Defendant's guilt. Mr. Bowling, Defendant's former co-worker, testified that Defendant commented that if his girlfriend ever cheated on him, he would kill her and the other man. Defendant's former cell mate, Mr. Graves, testified that Defendant told him that if he were to ever catch the victim cheating, "he was going to blow her f***ing head off." Another former cell mate, Mr. Goebel, testified that Defendant told him that he watched victim Meekins' house, that he killed her, and that his family would be his alibi for the murders. Mr. Goebel also testified that Defendant told him that he was surprised that he tested positive for gun residue since

he went into the swimming pool after the incident in an effort to remove any gun residue that may have been present.

A friend of victim Dan Dyer, Mr. Green, testified that victim Dyer told him that Defendant stated that victim Dyer ruined his life. Victim Meekins' neighbor, Mr. Mahoney, testified that on the night of the murders he heard noises outside of his house and voices that stated "we're over here" prior to hearing a car door close. Mr. Mahoney's testimony rejects Defendant's theory that it was impossible to have walked to victim Meekins' home when the crimes were committed. Mr. Tucker, a Florida Department of Law Enforcement Analyst, testified that Defendant's fingerprints were found on the shotgun that was used in the murders.

Additionally, testimony was presented at trial that Defendant was possessive and excessively called victim Meekins wanting to know her whereabouts and who she was with when she was not home. Audio recordings of Defendant and victim Meekins' brother, Colton Meekins (hereinafter "Mr. Meekins"), were played to the jury. The audio recordings reflected that Mr. Meekins went into victim Meekins' online accounts and read and erased messages from other men. The audio recordings also reflected that Defendant admitted that he went into victim Meekins' online account in the past and deleted messages from other men. The jury heard telephone calls between Defendant and his brother, Kory Gregory (hereinafter "Mr. Gregory"), that reflected

> Defendant's attempt to influence his family
> members' statements.

(Record citations omitted.)

> We conclude that, for the same reasons we find
> that Gregory was not prejudiced by his attorney's
> failure to further impeach Giovine during the trial,
> Gregory would not have been acquitted had he been
> granted a new trial based on the newly discovered
> evidence of Giovine's recantation.

> Accordingly, we affirm the postconviction court's
> order denying Gregory relief.

Gregory, 224 So. 3d at 736-37.

Respondents argue that this claim is unexhausted and procedurally defaulted because when raising this claim in state court, Petitioner did not present it as a claim of federal constitutional dimension. Resp. at 61. Petitioner asserts that the Court should consider the merits of the claim, despite any alleged procedural default, because Giovine's recantation is evidence of Petitioner's actual innocence. Doc. 18 at 10.

Even assuming this claim is exhausted and properly presented to the Court, it is still without merit because the Florida Supreme Court's adjudication of this issue is entitled to deference. In applying that deference, the Court notes that Giovine's recantation would not have affected the outcome of Petitioner's case considering the totality of the evidence supporting the jury's guilty verdicts. This Court concludes that the state court's decision was not based on

an unreasonable determination of the facts given the evidence presented to the state court, nor was it based on an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d). Ground Five is denied.

**F. Ground Six**

Petitioner argues that the cumulative effect of trial counsel's errors, as alleged in Grounds One through Four of his Petition, deprived him of his rights under the Sixth and Fourteenth Amendments. Doc. 1 at 43-44. Petitioner raised this claim in his Rule 3.851 motion. Resp. Ex. 5. The trial court denied the claim, Resp. Ex. K at 10, and the Florida Supreme Court affirmed the trial court's denial, Gregory, 224 So. 3d at 740 n.4 ("Because Gregory has failed to prove ineffective assistance of counsel on each of the underlying claims, we also conclude that Gregory is not entitled to relief on his claim of cumulative error.").

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (internal quotation marks omitted). The Eleventh Circuit addresses "claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that [it] find[s] in the aggregate and in light of the trial as a whole to determine whether

33

the appellant was afforded a fundamentally fair trial." <u>Morris v. Sec'y, Dep't of Corr.</u>, 677 F.3d 1117, 1132 (11th Cir. 2012). Because the Court has determined that none of Petitioner's individual claims of error or prejudice have merit, Petitioner's cumulative error claim cannot stand. <u>See</u> <u>United States v. Taylor</u>, 417 F.3d 1176, 1182 (11th Cir. 2005) ("[There being] no error in any of the district court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit."). Accordingly, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. Ground Six is denied.

**G. Ground Seven**

Petitioner asserts that his appellate counsel was ineffective for failing to challenge on direct appeal the admissibility of Petitioner's jail phone calls. Doc. 1 at 45-52. According to Petitioner, before trial, trial counsel filed a motion in limine to exclude the jail calls and objected to the admission of each call during trial. <u>Id.</u> at 51-52. Petitioner asserts that the calls were irrelevant, prejudicial, and should have been excluded because they revealed that Petitioner was in jail for unrelated criminal activity and had a negative "emotional impact." <u>Id.</u> at 50. He contends that appellate counsel's decision to abandon those preserved

challenges was so prejudicial as to amount to no assistance at all under the purviews of <u>United States v. Chronic</u>, 466 U.S. 648 (1984). <u>Id.</u> at 47.

During his appeal of his Rule 3.851 motion, Petitioner, with help from counsel, filed with the Florida Supreme Court a petition for writ of habeas corpus raising this claim of ineffective assistance of appellate counsel. Resp. Ex. N. The Florida Supreme Court denied the claim, explaining:

> First, to the extent Gregory contends that appellate counsel was ineffective for failing to argue that the court erred by admitting, over the defense objection, the jailhouse phone calls that were introduced by the State, we conclude that Gregory is not entitled to relief. Appellate counsel is not required to argue every preserved issue on appeal, particularly when that issue is meritless. In <u>Simmons v. State</u>, 105 So. 3d 475, 512 (Fla. 2012) (citing <u>Davis v. State</u>, 928 So. 2d 1089, 1126-27 (Fla. 2005)), this Court recognized that appellate counsel cannot present every conceivable claim on direct appeal.

> Because we conclude that the trial court did not abuse its discretion in allowing the jailhouse phone calls to be admitted, we deny relief as to this claim. The phone calls at issue were taped while Gregory was incarcerated during the summer of 2007, before the murders. In denying the defense's motion in limine with respect to the calls, the trial court stated:

>> The State MAY offer as evidence relevant recorded telephone conversations between the Defendant and certain witnesses while the Defendant was incarcerated in the Flagler and St. Johns County Jails. These calls include, but are not limited to, the following:

a. Conversations between the Defendant and Skyler Meekins' brother, Colton Meekins, prior to the murders concerning Skyler Meekins' whereabouts, activities and communications as they related to other guys. These conversations include, but are not limited to requests by the Defendant for Colton Meekins to access Skyler Meekins' home computer, review her personal e-mails and MySpace account, and delete photographs of and communications between other guys. Such conversations are relevant to the issue of motive and are, accordingly, admissible at trial.

b. Conversations between the Defendant and Skyler Meekins, Kory Gregory and/or Linda Probert prior to the murders concerning the relationship between the Defendant and Skyler Meekins, Skyler Meekins' conduct, and/or the Defendant's plans when he was released from jail. These-conversations provide the context and background of the relationship and are relevant to the issue of motive.

c. Conversations between the Defendant and Kory Gregory and Linda Probert after the murders pertaining to his association to the murders, or the lack thereof. Such statements are clearly relevant to the issues of this case.

d. Conversations between the Defendant and Amber Curnutt after the murders in which the Defendant discusses shooting a gun the day before the murders and her relaying that information to law enforcement. As stated previously, these

statements are relevant to the issue of the Defendant's consciousness of guilt.

These calls, collectively, are quite lengthy and include a number of conversations that are not relevant to any issue in the case. These irrelevant conversations must be redacted prior to their publication of them at trial. Counsels for the State and the Defendant have agreed to collaborate and attempt to agree on the necessary redactions. To the extent that the parties are not able to agree, then they will submit to the court those conversations that remain in dispute, at which time the court will resolve the matter.

This ruling was not erroneous. The calls may have painted Gregory in a bad light, as Gregory contends; however, they also had considerable probative value as to the context of Gregory's relationship with Meekins and Gregory's possible motive for the crime. Additionally, the trial court required the State to redact the phone calls by removing any irrelevant information. Accordingly, had appellate counsel raised this claim on appeal it would have been rejected. Appellate counsel cannot be ineffective for failing to raise a meritless claim. Simmons, 105 So. 3d at 512.

Next, with respect to Gregory's Cronic claim, this claim is not a proper habeas claim and, in any event, it is without merit as to any inference that his appellate counsel did not function as proper appellate counsel. While we acknowledge that the appellate brief was only twenty-eight pages, Gregory has failed to address any other meritorious issues that should have been raised. Thus, this claim is meritless.

Accordingly, we deny habeas relief.

37

<u>Gregory</u>, 224 So. 3d at 739-40.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Seven is denied.

### H. Ground Eight

Petitioner asserts that the trial court erred in denying Petitioner's motion to disqualify the trial judge. Doc. 1 at 54. According to Petitioner, the trial judge made biased comments during a pretrial hearing on Petitioner's motion in limine, referring to statements Petitioner allegedly made to former coworker and jailhouse inmate Francis Bowling before the murders as "prophetic" and that hearing the victim Skyler's voice on certain jail recordings as "refreshing" as it "had been silenced." <u>Id.</u> As such, he contends his motion to disqualify was sufficient and should have been granted.

Petitioner, with help from appellate counsel, raised this issue during his direct appeal. Resp. Ex. B at 10. The Florida Supreme Court affirmed the trial court's denial of the motion, explaining:

The first issue Gregory raises is the trial court's denial of his motion to disqualify the judge as legally insufficient. "A motion to disqualify is governed substantively by section 38.10, Florida Statutes . . . and procedurally by Florida Rule of Judicial Administration 2.330." Gore v. State, 964 So. 2d 1257, 1268 (Fla. 2007). The moving party must file an affidavit in good faith "stating fear that he or she will not receive a fair trial . . . on account of the prejudice of the judge," as well as "the facts and the reasons for the belief that any such bias or prejudice exists." § 38.10, Fla. Stat. (2011). "The judge against whom an initial motion to disqualify . . . is directed shall determine only the legal sufficiency of the motion and shall not pass on the truth of the facts alleged." Fla. R. Jud. Admin. 2.330(f).

"Whether the motion is legally sufficient requires a determination as to whether the alleged facts would create in a reasonably prudent person a well-founded fear of not receiving a fair and impartial trial." Rodriguez v. State, 919 So. 2d 1252, 1274 (Fla. 2005). "A motion to disqualify a judge 'must be well-founded and contain facts germane to the judge's undue bias, prejudice, or sympathy.'" Wright v. State, 857 So. 2d 861, 873 (Fla. 2003) (quoting Jackson v. State, 599 So. 2d 103, 107 (Fla. 1992)). "A mere 'subjective fear[ ]' of bias will not be legally sufficient; rather, the fear must be objectively reasonable." Arbelaez v. State, 898 So. 2d 25, 41 (Fla. 2005) (quoting Fischer v. Knuck, 497 So. 2d 240, 242 (Fla. 1986)).

"If the motion is legally sufficient, the judge shall immediately enter an order granting disqualification and proceed no further in the action." Fla. R. Jud. Admin. 2.330(f). However, "[i]f any motion is legally insufficient, an order denying the motion shall immediately be entered. No other reason for denial shall be stated, and an order of denial shall not take issue with the motion." Id.

Whether the motion is legally sufficient is a question of law, and the standard of review of a trial judge's determination of a motion to disqualify is de novo. <u>Stein v. State</u>, 995 So. 2d 329, 334 (Fla. 2008). Gregory argues that his motion to disqualify was legally sufficient because several of the trial judge's comments displayed a bias against him and furthered his belief that he would not receive a fair trial. We conclude that Gregory's argument is without merit.

The alleged grounds for disqualification arose during a pretrial hearing regarding the admissibility of certain pieces of evidence the State intended to introduce at trial. Gregory argued that a statement he made eight months before the murders about killing "both of them" if his girlfriend ever cheated on him was too remote to be relevant. In response to this argument, the trial judge stated:

> My reaction here is that this is not remote at all, that it's – while there is some time delay – and <u>if he is, in fact, the one who committed the murder, it is quite prophetic in terms of what's going to happen</u>. So, you know, we're not talking about ten years or five years or three years. We're talking about just months before the breakup and then the alleged murder happened later on.
>
> <u>Now, whether they can prove that he did this or not, that's another matter</u>, but it seems to me they are entitled to the benefit of trying to prove all the elements of the crime when one is premeditation, and this goes to that issue. So I'm going to . . . allow it.

(Emphasis supplied.)

Gregory argues that the trial judge's use of the word "prophetic" to describe the statement indicates

that the judge had already determined that Gregory was guilty. We conclude that this argument is unavailing because Gregory focuses on one word out of context without including the trial judge's actual statement. See generally Mansfield v. State, 911 So. 2d 1160, 1170-71 (Fla. 2005) (reading the trial judge's statement in the context of the timing of a plea offer); Moore v. State, 820 So. 2d 199, 206-07 (Fla. 2002) (viewing the trial court's ruling in the context of the order entered by the trial judge); Foster v. State, 778 So. 2d 906, 917 (Fla. 2000) (concluding, after a review of all the cited comments and the record as a whole, that the trial judge had not prejudged the case). When read as a whole, it is clear that the judge used the word "prophetic" in relation to the State's argument that Gregory's statement was relevant to the issue of premeditation. Indeed, the judge's actual statement was that "if he [Gregory] is, in fact, the one who committed the murder, it is quite prophetic in terms of what's going to happen." (Emphasis supplied.)

In addition to the "prophetic" comment, Gregory's disqualification motion also alleged that the trial judge demonstrated bias against him during a part of the same pretrial hearing concerning the admissibility of recorded telephone calls between Gregory and Skyler. Gregory alleged in his motion that the trial judge stated that hearing the victim's voice would be "refreshing" because she "has now been silenced," and that this constituted a legally sufficient basis for disqualification.

As it relates to this comment, we begin by noting that Gregory's disqualification motion and accompanying affidavit misstated the judge's remarks. At no point during the relevant part of the hearing did the judge use the word "refreshing." Instead, the trial judge stated that he found it "quite interesting" that the jury would be able to hear the victim's voice. The judge did not make any reference to Gregory being the

one who "silenced" the victim, nor did he comment on Gregory's guilt or innocence.

Although trial counsel apparently did not intentionally misrepresent the judge's comment but instead misheard the remarks, a motion made on a trial judge's statement in open court that does not accurately represent what has actually been said cannot comply with the requirement that an affidavit be made "in good faith." <u>See</u> § 38.10, Fla. Stat. (2011). Further, for the motion to be legally sufficient, a movant cannot simply pluck one word from a full sentence made by the trial judge and omit the remainder of the statement.

To the extent Gregory claims that the trial judge's remarks may have produced an improper emotional response to prospective jurors, this argument is unavailing because the remarks were not made to the jury. Gregory appears to argue that the publication of these comments in the press created a public prejudice against him, and as support, he attached a newspaper article to his disqualification motion. However, Gregory raises no challenge to jury selection or composition or to pretrial publicity, and he provides no factual basis beyond the comments and news report attached to the motion itself to substantiate these claims.

Accordingly, because Gregory has not alleged any facts that "would create in a reasonably prudent person a well-founded fear of not receiving a fair and impartial trial," <u>Rodriguez</u>, 919 So. 2d at 1274, we conclude that the trial court did not err as a matter of law in denying Gregory's motion to disqualify.

<u>Gregory v. State</u>, 118 So. 3d 770, 778-80 (Fla. 2013).

If Petitioner urges that the state court erred under Florida law when it allowed the state to present this evidence, this assertion is not cognizable on

federal habeas review. However, to the extent this claim is cognizable here, the Florida Supreme Court's adjudication is entitled to deference. And in applying such deference, the Court concludes that the state court's decision was not based on an unreasonable determination of the facts given the evidence presented to the state court, nor was it based on an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d). Ground Eight is denied.

**I. Ground Nine**

Petitioner contends that the trial court erred in denying his third motion in limine. Doc. 1 at 56. According to Petitioner, in that motion, he sought to exclude the testimony of state witness Francis Bowling, Petitioner's former coworker and fellow jail inmate, who testified about statements Petitioner allegedly made about eight months before the murders. Id. Petitioner argued the statements were too remote, and thus irrelevant and prejudicial. Id.

Petitioner raised this claim in his counseled brief on direct appeal. Resp. Ex. B at 13. The Florida Supreme Court denied the claim, finding as follows:

> Gregory contends that the trial court improperly admitted a statement made by Gregory eight months before the murder to a former co-worker that, if Gregory ever caught his girlfriend cheating on him, he would kill them both. The State contends that Gregory's statement shows premeditation and intent to kill. We conclude that Gregory's statement was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice, and the trial court therefore did not err in admitting this statement.

43

"This Court reviews evidentiary rulings for abuse of discretion. A judge's discretion is limited by the rules of evidence and by the principles of stare decisis." Johnson v. State, 969 So. 2d 938, 949 (Fla. 2007) (citation omitted). "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2011). "All relevant evidence is admissible, except as provided by law." § 90.402, Fla. Stat. (2011).

Relevant evidence "is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." § 90.403, Fla. Stat. (2011). "The trial court is obligated to exclude evidence in which unfair prejudice outweighs the probative value in order to avoid the danger that a jury will convict a defendant based upon reasons other than evidence establishing his guilt." McDuffie v. State, 970 So. 2d 312, 327 (Fla.2007).

The issue before the Court is whether the eight-month delay between Gregory's statement and the murders lessens the statement's relevance to the point that it should have been excluded from evidence in this case. A review of Florida case law indicates that there is no bright-line rule regarding the point at which a prior statement is so remote as to become irrelevant. However, this Court has previously upheld as relevant to the issue of premeditation a defendant's statement, made five months before the murder, that he intended to kill the victim. See LaMarca v. State, 785 So. 2d 1209, 1215 (Fla. 2001).

Gregory relies on a Nevada Supreme Court case stating that "events remote in time from the charged incident have less relevance in proving later intent." Walker v. State, 116 Nev. 442, 997 P.2d 803, 806-07 (2000). Although that observation is generally accurate, the statements in the Nevada case were made

six and ten years prior to the murder. Therefore, <u>Walker</u> is not helpful authority for Gregory, whose statement was made less than a year before the murders in this case. As to Gregory's additional suggestion that his prior statement did not indicate an intent to kill because the threat was not taken seriously, that argument goes to the weight of the evidence, not its admissibility.

Even relevant evidence, though, must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. § 90.403, Fla. Stat. Gregory contends that the prejudice of implying from his statement an intent to kill is unduly prejudicial. However, this Court has previously upheld the admissibility of other relevant threatening statements similar to the one in this case. <u>See</u> <u>Floyd v. State</u>, 18 So. 3d 432, 448 (Fla. 2009); <u>Dennis v. State</u>, 817 So. 2d 741, 762 (Fla. 2002); <u>Pittman v. State</u>, 646 So. 2d 167, 170-71 (Fla. 1994).

Because Gregory's prior statement provides evidence of his motive and intent in murdering his former girlfriend and her new boyfriend, and because the statement was not so remote in time as to have minimal probative value, we conclude that the trial court did not abuse its discretion in applying the applicable case law to the facts of this case to conclude that Gregory's statement was admissible.

<u>Gregory</u>, 118 So. 3d at 780-81.

Again, if Petitioner urges that the state court erred under Florida law when it allowed the state to present this evidence, this assertion is not cognizable on federal habeas review. "As a general rule, a federal court in a habeas corpus case will not review the trial court's actions concerning the admissibility of evidence," because the state court "has wide discretion in

determining whether to admit evidence at trial[.]" <u>Alderman v. Zant</u>, 22 F.3d 1541, 1555 (11th Cir. 1994); <u>see also</u> <u>Baxter v. Thomas</u>, 45 F.3d 1501, 1509 (11th Cir. 1985) (federal habeas corpus is not the proper vehicle to correct evidentiary rulings); <u>Boykins v. Wainwright</u>, 737 F.2d 1539, 1543 (11th Cir. 1984) (federal courts are not empowered to correct erroneous evidentiary rulings in state court except where rulings deny petitioner fundamental constitutional protections).

But to the extent this claim is properly presented to the Court, the Florida Supreme Court's adjudication is entitled to deference. And in applying such deference, the Court finds the state court's evidentiary ruling did not "'so infuse[] the trial with unfairness as to deny due process of law.'" <u>Smith v. Jarriel</u>, 429 F. App'x 936, 937 (11th Cir. 2011) (quoting <u>Felker v. Turpin</u>, 83 F.3d 1303, 1311-12 (11th Cir. 1996)). Bowling's testimony about Petitioner's prior statements was relevant and not remote enough to lose material value. Accordingly, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. Ground Nine is denied.

### J. Ground Ten

Petitioner contends that the trial court erred in allowing the state, over trial counsel's objection, to present testimony from Tyrone Graves, a fellow

inmate housed with Petitioner before the murders. Doc. 1 at 58. Petitioner asserts that Graves could not make an in-court identification of Petitioner during trial, rendering his testimony inadmissible. Id.

Petitioner raised this claim with the Florida Supreme Court during his direct appeal. Resp. Ex. B at 14. The Florida Supreme Court found the claim lacked merit and affirmed Petitioner's conviction. It explained:

> Gregory next argues that the trial court should have excluded testimony from Tyrone Graves, an individual who said he met and spoke with Gregory while the two were in jail at the same time, because Graves did not provide an in-court identification of Gregory. The State contends that the information Graves provided, including a physical description of Gregory and Gregory's independently verified phone number, was sufficient to identify Gregory and establish the relevance of the testimony. We agree and conclude that there was no basis for excluding this testimony.
>
> The sole issue Gregory raises with respect to this claim is Graves's failure to identify Gregory in court when asked whether he saw Gregory in the courtroom. However, aside from objecting on general relevancy grounds, Gregory provides no basis to support his claim that Graves's testimony about comments attributed to Gregory should have been excluded.
>
> A review of the record shows that, even if an in-court identification was necessary under these circumstances, Graves provided a precise identification of Gregory as the person who uttered the remarks about which Graves testified. During his testimony, Graves offered a physical description of Gregory, which Gregory does not challenge. Further, Graves had previously given Gregory's phone number, which

Gregory provided to Graves during their time in jail together, to law enforcement, who independently verified its accuracy. Graves had also previously called the phone number and testified that he recognized the voice as the inmate he knew as Gregory.

In short, Gregory does not allege any facts, other than Graves's failure to make an in-court identification, to indicate that the statements to which Graves testified were not made by Gregory and that this testimony was therefore not relevant. In addition, even if there is any question regarding whether Graves correctly identified Gregory as the one who made the statements, that issue goes to the weight of the testimony, not its admissibility.

Accordingly, this testimony was relevant and the trial court did not err in admitting the testimony.

Gregory, 118 So. 3d at 781-82.

Again, Petitioner's allegations that the trial court violated state law are not proper for the Court's consideration, because the state court "has wide discretion in determining whether to admit evidence at trial[.]" Alderman, 22 F.3d at 1555; see also Baxter, 45 F.3d at 1509; Boykins, 737 F.2d at 1543. Nevertheless, to the extent this claim is properly before the Court, the Florida Supreme Court's adjudication is entitled to deference.

In applying such deference, the Court finds Petitioner's claim here lacks merit because the state court's evidentiary decision to allow Graves's testimony to proceed did not "'so infuse[] the trial with unfairness as to deny due process of law.'" Smith, 429 F. App'x at 937 (quoting Felker, 83 F.3d at 1311-12).

Although Graves could not identify Petitioner in court, Graves testified to other identifying facts about Petitioner, and any failure to accurately identify Petitioner at trial merely goes to the weight of Graves's trial testimony. Accordingly, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. Ground Ten is denied.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.      The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED with prejudice**.

2.      The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3.      If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[3]

**DONE AND ORDERED** at Jacksonville, Florida, this 7th day of February, 2022.



TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:     William A. Gregory, #V19422
       counsel of record

---

[3] The Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.